1
2
3
4
5
6
7
8
9
10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17

| | |
|---|---|
| WILLIAM CODY CARTER, an individual,<br>Plaintiff,<br><br>vs.<br><br>CITY OF CARLSBAD, a California Public Entity, SCOTT MERITT, an individual and in his official capacity, and DOES 1 though 10, inclusive,<br><br>Defendants. | **CASE NO: 10-CV-1072-IEG (BLM)**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 41] |

18
19
20
21

Presently before the Court is Defendants' motion for summary judgment.  [Doc. No. 41.]  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

22

## BACKGROUND

23
24
25
26
27
28

On Saturday, October 31, 2009, Plaintiff William Cody Carter ("Carter" or "Plaintiff"); his fiancée, Megan Damico ("Megan"); Megan's sister, Jalyn Damico ("Jalyn"); Virginia Mula, and Judah Stauffer planned to spend the evening at the Coyote Bar & Grill in Carlsbad (the "Coyote").  Before going to the Coyote, the group met at Carter's apartment, where Carter consumed approximately ten ounces of Jack Daniel's whiskey mixed with approximately twenty ounces of cola.  [Defs.' MSJ, at 2; Carter Dep., at 10-12.]

Once they arrived at the Coyote, Carter was denied entrance to the bar.  Still in the bar's parking lot, Carter complained loudly about not being allowed in and then left for his apartment, accompanied by Megan, Jalyn, and Mula.  [Megan Damico Dep., at 63:11-64:23, 66:1-67:24, 69:1-24; Jalyn Damico Dep., at 53:2-9.]  The group walked out of the parking lot along the western boundary of Rotary Park, cut through the grass, and headed east on Carlsbad Village Drive, toward the railroad tracks.  [Pl.'s Opp'n, at 2; see Defs.' MSJ, at 2.]

As it was Halloween, the members of the group were all dressed in costumes.  Carter, a former Marine, was dressed as a Marine and wore camouflage pants, a T-shirt, and a military "cover" on his head.  At the time of the incident, Carter was twenty-five years old, six feet four inches tall, and weighed approximately 170 pounds.  [Carter Decl., ¶ 1.]

Several independent witnesses observed the incident, though some of their recollections differ slightly.  As Carter, Megan, and Jalyn walked, they cried and yelled at each other, and it appeared they were engaged in a verbal altercation.  [See Sarah Maruccia Dep., at 15:4-12, 16:19-23, 17:6-14; Mark Maruccia Dep., at 28:16-29:15; 32:15-33-1; Varela Dep., at 41:22-42:10, 82:14-20; Cangiamilla Dep., at 38:11-16, 45:5-22.]  Megan and Jalyn repeatedly tried to calm Carter, but he responded each time by yelling, flailing his arms about, and trying to pull away from his friends.  [See Varela Dep., at 40:18-24, 46:7-17, 82:14-20; Mark Maruccia Dep., at 28:16-29:15; 32:15-33-1; Cangiamilla Dep., at 11:1-6, 17:1-15, 24:14-24.  But see Doyle Dep., at 47:15-18 (rather than trying to leave, Carter was following his companions).]  As he walked, Carter may have thrown the head cover he was wearing, a set of keys, or other items to the ground and picked some of the items back up.  [See Mark Maruccia Dep., at 39:21-41:14; Sarah Maruccia Dep., at 24:17-26:1, 31:3-23.]

At approximately 10:15 p.m., two officers of the Carlsbad Police Department—Officer Scott Meritt ("Officer Meritt") and Corporal Richard Galanos ("Cpl. R. Galanos")—and one police explorer—Explorer Brendan Galanos ("Explorer B. Galanos"), Cpl. R. Galanos's son—were on foot patrol, walking the 3000 block of Washington Street when "their attention was drawn to an argument between an agitated male (plaintiff) and several others who were trying to calm him."  [Defs.' MSJ, at 3; see Meritt Decl., ¶ 6; Cpl. R. Galanos Decl., ¶ 6.]  Officer Meritt saw Carter yelling at a female and

grabbing her hands; it appeared he was attempting to take an item from her.[1]  [Meritt Decl., ¶ 6.] Meritt also observed Carter throw something into the grass area of Rotary Park.  [Id.; see also Carter Dep., at 48:5-49:15 (Carter discusses throwing his cellular telephone into the grass area of Rotary Park).]  Carter then retrieved the item and continued to yell in the direction of the female.  [Meritt Decl. ¶ 6.]

The officers did not see Carter strike anyone.  They nonetheless grew concerned that he might harm the female or continue to cause a disturbance, and they approached Carter.  [Meritt Decl., ¶ 6; Cpl. R. Galanos Decl., ¶ 6.]

When the officers approached, Carter, Megan, and Jalyn were still yelling at one another. [Megan Damico Dep., at 79:19-20, 100:11-17, 128:14-129:5; Varela Dep., at 51:2-18 (noting that Carter was yelling "at the top of his lungs").]  Megan heard one of the officers yell, "Stop."  [Megan Damico Dep., at 71:13-25, 73:23-74:4, 77:12-25.]  When the officers first came into her view, Megan saw they were wearing police uniforms and badges and recognized them as police officers.  [See id. at 76:23-77:11.]  Megan told the officers that Carter had been drinking and she was taking him home. [Id. 95:13-18, 126:8-16.]

There is some dispute as to exactly what occurred next.  According to the officers, Cpl. R. Galanos shined his flashlight on Carter and ordered him to sit on the curb. [Cpl. R. Galanos Decl., ¶ 7; Officer Meritt Decl., ¶ 7; Explorer B. Galanos Dep., at 40:5-14.]  Carter ignored the officers, and he, Megan, and Jalyn continued yelling at one another.  [See Officer Meritt Decl., ¶¶ 6-7; Cpl. R. Galanos Decl., ¶¶ 6-7; Megan Damico Dep., at 98:1-100:25.]  Plaintiff yelled, "Why?" several times.  [Cpl. R. Galanos Dep., 56:8-57:2.]  Based on Plaintiff's inability to follow instructions, his yelling, and his agitated behavior, Officer Meritt and Cpl. R. Galanos concluded that Plaintiff was very drunk.  [Meritt Decl., ¶ 7; Cpl. R. Galanos Decl., ¶ 7.]

When Carter began to walk away from the officers, Cpl. R. Galanos yelled, "Hey, stupid!" [Explorer B. Galanos Dep., at 34:11-13, 39:5-25; see Cpl. R. Galanos Dep., at 102:8-18.]  At that point, Carter turned to face the officers, cocked his right arm back, and took a "throwing stance."

---

[1] Although the officers' declarations discuss observing Carter and one female, it appears that Megan, Jalyn, and Mula were all present at the time of the incident.  [See Megan Damico Dep., at 128:14-129:5.]

[Meritt Decl., ¶ 7.  But see Doyle Dep., 33:22-34:24 (stating she did not see Carter "rear back like he was going to throw something"); Cangiamilla Dep., at 28:21-29:4 (same).]  Officer Meritt and Cpl. R. Galanos observed an unidentified object in Carter's right hand (later determined to be a set of keys). [Meritt Decl., ¶ 7; Cpl. R. Galanos Decl., ¶¶ 7-8.  But see also Explorer B. Galanos Dep., at 34:9-17 (stating he immediately recognized the object as keys); Meritt Dep., at 258:12-25 (stating he knew the object was not a gun).]

Carter then yelled, "What?" and took an offensive fighting stance, "raising his shoulders and enlarging his upper body while standing square with the officers."[2]  [Meritt Decl., ¶ 7; see Cpl. R. Galanos Decl., ¶ 7; see also Varela Dep., at 51:19-53:1; Sarah Maruccia Dep., at 24:17-26:1; Mark Maruccia Dep., at 42:1-3.  But see Doyle Dep., 33:22-34:24 (stating Carter never took a fighting stance); Cangiamilla Dep., at 28:21-29:4 (same).]  Cpl. R. Galanos ordered Carter, at least two more times, to sit on the curb, but Carter, about eight or ten feet away from the officers, did not comply and continued screaming.  [Cpl. R. Galanos Decl., ¶¶ 7-8; Meritt Decl., ¶¶ 7-8.]  Meritt and Cpl. R. Galanos drew their tasers and pointed them at Carter.  Officer Meritt stated loudly, "Sit, or you will be tased," and Carter turned his attention toward Officer Meritt.  [Cpl. R. Galanos Decl., ¶ 8; Meritt Decl., ¶ 8; see also Varela Dep., at 54:19-55:22.]  Cpl. R. Galanos saw Carter clench his right fist, which appeared to hold the unidentified object, and move toward Officer Meritt.  [Cpl. R. Galanos Decl., ¶ 8; see also Sara Maruccia Dep., 24:17-26:1, 31:3-23 Mark Maruccia Dep., 39:21-41:14.  But see Meritt Dep., at 139:10-18 (Meritt did not see Carter take steps toward him, but he was not watching Carter's feet).]  Officer Meritt deployed his taser in "dart mode," which shoots darts at a suspect from a distance.

Megan Damico, Carter's fiancée, recalls the incident somewhat differently.[3]  As their group walked east on Carlsbad Village Drive, Megan heard an unidentified person yell, "Stop."  [Megan

_____

[2] Carter may also have removed items from his pockets and thrown them to the ground, though none of the officers stated this occurred.  [See Sara Maruccia Dep., 24:17-26:1, 31:3-23; Mark Maruccia Dep., 39:21-41:14.]

[3] Carter himself has no recollection of the interaction with the officers or the tasing.  The last thing he remembers that evening is throwing his cellular telephone in the park after leaving the Coyote. [Carter Dep., 43:18-25, 77:19-22.]  Carter admits, however, that he tends to be loud when intoxicated, due in part to "minimal" hearing loss incurred during his time in the military.  [Id. at 77:23-78:2.]

Damico Dep., at 72:15-18.]  Megan saw the officers as they ran toward the group from across the street.  The officers never verbally identified themselves as police, but Megan immediately recognized them as officers because they were in uniform.  Officer Meritt already had his hand on his taser as the officers approached, and it remained there after the officers reached Carter's group.  [See id. at 77:7-11, 95:2-12.]

Megan attempted to explain that she was taking Carter home.  Oblivious to the officers' presence, Carter continued arguing with Jalyn.  [Id. at 95:19-22.]  Cpl. R. Galanos yelled, "Hey Stupid."  The officers continued speaking in the group's direction, but what they said was unclear because several people spoke at once.  [See id. at 98:1-25.]  Carter turned around, raised his hands, and yelled, "What?" or "Why?" twice, and Officer Meritt tased Carter from a distance of ten or fifteen feet.  [Cangiamilla Dep., at 30:14-16; Doyle Dep., at 21:11-14.]  The entire incident, from the officers' first interaction with the group to the tasing of Carter, took approximately fifty seconds.  [See Explorer B. Galanos Dep., at 58:5-11 (the time from the officer's initial radio call to dispatch to the call for paramedics was approximately fifty seconds).  But see Sergeant Koran Dep., at 100:7-25 (the initial call-in time is not necessarily the time the officers first approached Carter).]

The remaining facts are undisputed.  The taser darts contacted Carter's chest and abdomen.  He stood straight and fell backward, striking his head on the sidewalk and fracturing his skull.  When the taser's five-second cycle completed, Officer Meritt immediately requested paramedics.  Carter spent three nights in intensive care and four more under a neurosurgeon's care.  Carter claims to suffer from permanent hearing loss and balance problems as a result of the incident.

Carter's blood alcohol level was measured at the hospital.  Approximately one hour after the incident, at 11:15 p.m., his BAC measured .15.  [Megan Damico Dep., at 42:20.]  Carter was later charged with violations of California Penal Code Sections 148(a)(1) (resisting, delaying, or obstructing a police officer) and 647(f) (public intoxication).  The charge under section 148(a) was later dropped, but Carter pleaded guilty to public intoxication under section 647(f).

Carter's First Amended Complaint alleges six causes of action against Defendants Meritt and the City of Carlsbad (the "City"): (1) excessive force under 42 U.S.C. § 1983, against Officer Meritt; (2) failure to train under 42 U.S.C. § 1983, against the City; (3) failure to supervise under 42 U.S.C. § 1983, against the City; (4) battery under California State law, against Meritt and the City;

(5) negligence under California State law, against Meritt and the City; and (6) a violation of California Civil Code section 52.1 against Meritt and the City.  Defendants seek summary judgment on each of Carter's claims.

## **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Miller v. Glenn Miller Prod., Inc., 454 F.3d 975, 987 (9th Cir. 2006).

In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial.  Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).  When the nonmoving party would bear the burden of proof at trial, the moving party may satisfy its burden on summary judgment by simply pointing out to the Court an absence of evidence from the nonmoving party.  Miller, 454 F.3d at 987.  "The moving party need not disprove the other party's case."  Id.

Once the movant has made that showing, the burden shifts to the opposing party to produce "evidence that is significantly probative or more than 'merely colorable' that a genuine issue of material fact exists for trial."  LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1137 (9th Cir. 2009) (citing FTC v. Gill, 265 F.3d 944, 954 (9th Cir. 2001)); see also Miller, 454 F.3d at 988 ("[T]he non-moving party must come forward with more than 'the mere existence of a scintilla of evidence.'") (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The Court must review the record as a whole and draw all reasonable inferences in favor of the nonmoving party.  Hernandez v. Spacelabs Med. Inc., 343 F.3d 736, 738 (9th Cir. 2000).  However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment.  Id.; Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).  "Thus, '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Miller, 454 F.3d at 988 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

1

## DISCUSSION

2

**I.    42 U.S.C. § 1983 Against Officer Meritt—Excessive Force**

3

Defendants move for summary judgment on Carter's § 1983 claim against Meritt for excessive

4

force, arguing that Carter's constitutional rights were not violated because Officer Meritt's use of the

5

taser was reasonable under the circumstances.  Defendants further argue that, even if Carter did suffer

6

a constitutional deprivation, Officer Meritt is entitled to qualified immunity because the state of the

7

law surrounding the appropriate use of tasers was sufficiently unclear that a reasonable officer would

8

not have known his use of the taser violated Carter's constitutional rights.

9

In evaluating a police officer's assertion of qualified immunity, the Court makes two

10

determinations.  The Court decides, first, whether, "taking the facts in the light most favorable to the

11

non-moving party, the officer's conduct violated a constitutional right; and second, if a violation

12

occurred, whether the right was clearly established in light of the specific context of the case."  Bryan

13

v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010) (internal quotation marks omitted).  The Court has

14

discretion to address either prong of the qualified immunity analysis first.  Pearson v. Callahan, 555

15

U.S. 223, 129 S. Ct. 808, 818 (2009).

16

**A.  Whether Carter Suffered a Constitutional Deprivation**

17

The Court examines allegations of excessive force under the Fourth Amendment's prohibition

18

on unreasonable seizures.  Bryan, 630 F.3d at 823.  The Court inquires "whether the officers' actions

19

are 'objectively reasonable' in light of the facts and circumstances confronting them."  Id. (quoting

20

Graham v. Connor, 490 U.S. 386, 397 (1989)).  The Court "must balance the nature and quality of the

21

intrusion on the individual's Fourth Amendment interests against the countervailing governmental

22

interests at stake."  Id. (internal quotation marks omitted); see also Deorle v. Rutherford, 272 F.3d

23

1272, 1280 (9th Cir. 2001).  "Stated another way, [the Court] must 'balance the amount of force

24

applied against the need for that force.'"  Bryan, 630 F.3d at 823-24 (quoting Meredith v. Erath, 342

25

F.3d 1057, 1061 (9th Cir. 2003)).  "This balance must be 'judged from the perspective of a reasonable

26

officer on the scene, rather than with the 20/20 vision of hindsight.'"  Boyd v. Benton Cnty, 374 F.3d

27

773, 779 (9th Cir. 2004) (quoting Graham, 490 U.S. at 396).  "The need for such balancing means that

28

'summary judgment . . . in excessive force cases should be granted sparingly.'"  Id. (quoting Santos v.

Gates, 287 F.3d 846 853 (9th Cir. 2002)); see Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994) ("Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury.").

1. **Nature and Quality of the Intrusion—"Intermediate Force"**

Officer Meritt shot Plaintiff from between eight and fifteen feet away with an X26 Taser deployed in "dart mode."  In Bryan v. MacPherson, the Ninth Circuit recently described the nature of force imposed by using a taser in dart mode:

> The X26 uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second.  Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles.  The impact is as powerful as it is swift.  The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.  The tasered person also experiences an excruciating pain that radiates throughout the body.

630 F.3d at 824 (internal footnotes and citations omitted).  This constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved."  Id. at 826.

2. **Governmental Interest in the Use of Force**

The Court considers three core factors to evaluate the government's interest in the use of force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  Id. (discussing Graham, 490 at 396).  But this list is not exhaustive; the Court must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.'"  Id. (quoting Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994)).  Viewing the facts in the light most favorable to Carter, as the Court must at this stage in the proceedings, see id. at 830, Carter suffered a constitutional deprivation.

i. **Whether Carter Posed a Threat to the Officers or Others**

The most important factor is whether the suspect posed an immediate threat to the safety of the officers or others.  Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting Chew, 27 F.3d at 1441).  However, "'[a] desire to resolve quickly a potentially dangerous situation is

1   not the type of governmental interest that, standing alone, justifies the use of force that may cause

2   serious injury.'"  Bryan, 630 F.3d at 826 (quoting Deorle, 272 F.3d at 1281).

3          Defendants, relying almost entirely on the officers' version of the facts, argue that Officer

4   Meritt reasonably believed Carter posed a danger to the officers and to Carter's companions.

5   Defendants claim: Carter was drunk; Carter roughly snatched items from and pushed one of his

6   companions; Carter yelled threateningly at his companions and at the officers; Carter held an unknown

7   item in his hands and made motions suggesting he would throw the item at the officers; Carter adopted

8   an aggressive, fighting posture and made threatening movements toward the officers[4]; and Carter could

9   have quickly closed the eight to ten feet separating him from the officers.  Moreover, throughout the

10  interaction, Carter ignored the officers' repeated instructions to sit down.  [See Defs.' MSJ, at 8-9.]

11         Carter paints a very different picture.  The officers approached the group with little warning,

12  yelling only "Stop" from across the street.  Far from afraid that Carter would harm them, one of his

13  companions attempted to inform the officers that Carter was intoxicated, but that they were taking him

14  home.  While the officers may have continued speaking during the encounter, no one other than the

15  officers claims to have heard any instructions or warnings to Carter that he may be tased.  Carter had

16  keys in his hand, which Explorer B. Galanos immediately recognized as keys.  Officer Meritt could not

17  immediately identify the object in Carter's hand as keys, but he did recognize that Carter was not

18  holding a gun.  Carter yelled, but he was not aggressive or belligerent toward the officers.

19  Furthermore, Carter was ten to fifteen feet away from the officers when Officer Meritt tased him.  [See

20  Pl.'s Opp'n, at 9.]

21         Genuine issues of fact regarding Carter's behavior preclude summary judgment on the

22  reasonableness of Officer Meritt's use of force.  Viewing the facts in the light most favorable to Carter,

23  this case is similar to Bryan: Carter acted bizarrely, but his "erratic, but nonviolent, behavior" did not

24  create a potential threat.  See Bryan, 630 F.3d at 827.  Moreover, as noted in Bryan, the presence of

---

25   
26         [4] Despite remembering nothing about the incident, Carter says that, rather than a
    confrontational stance, his posturing before the officers—"puffing his chest," bringing his "hands to
    [his] sides, and star[ing] straight ahead"—may have been his going into the "the position of Attention,"
27  as he was trained to do before superior officers in the Marine Corp.  [See Carter Decl., ¶¶ 4-6.]
    Carter's subjective intention, however, is irrelevant; the Court must assess whether and to what extent
28  a reasonable officer might have interpreted Carter's posturing and other actions as confrontational.

9

other officers "change[s] the tactical calculus confronting [an officer], likely opening up additional ways to resolve the situation without the need for an intermediate level of force." Id. at 831. Thus, this, the most important factor, does not justify Officer Meritt's use of intermediate force.

ii. **The Severity of the Crime at Issue**

The officers detained Carter on suspicion that he had violated California Penal Code Sections 148(a)(1) (resisting, delaying, or obstructing a police officer) and 647(f) (public intoxication), both misdemeanors. Misdemeanors are relatively minor and generally will not support the use of intermediate force. Id. at 828-29 & n.12. Neither of the offenses for which Carter was cited is inherently dangerous or violent. Thus, this factor militates against finding Officer Meritt's use of intermediate force reasonable. See id.

iii. **Whether Carter Attempted to Flee or Actively Resisted**

Defendants have not alleged that Carter attempted to flee. To the extent it can be said he "resisted" the officers at all, Carter offered only "passive" resistance. While resistance "should not be understood as a binary state," the Ninth Circuit has "drawn a distinction between passive and active resistance." Bryan, 630 F.3d at 829-30. Where a suspect's resistance is not particularly bellicose, it "provide[s] little support for a use of significant force." Id. at 830.

For example, the plaintiff in Bryan exited his vehicle, shouted gibberish, and repeatedly hit himself in the quadriceps during a routine traffic stop. The court characterized the plaintiff's behavior as "bizarre," but "a far cry from actively struggling with an officer attempting to restrain and arrest an individual." Id. Similarly, the Ninth Circuit has classified as passive resistance a suspect continuously ignoring an officer's commands to remove his hands from his pockets and not to re-enter his home, even where the plaintiff "physically resisted . . . for only a brief period of time." Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005) (en banc); see also Forrester v. City of San Diego, 25 F.2d 804, 805 (9th Cir. 1994) (a protestor's "remaining seated, refusing to move, and refusing to bear weight" despite contrary orders from police constituted "passive resistance").

Viewing the facts of this case in Carter's favor, the officers yelled, "Stop," as they approached his group from across the street. Once they reached the group, Cpl. R. Galanos yelled, "Hey Stupid." Carter turned around, raised his hands, and yelled, "What?" or "Why?" twice. Without providing clear

additional instructions, Officer Meritt tased Carter.  [<u>See</u> Megan Damico Dep., at 72:15-18, 95:2-12;

Varela Dep., at 54:9-22, 75:18-25 (stating that he could not hear whether the officers gave any

additional instructions prior to tasing Plaintiff).]  The entire interaction between the officers and Carter

lasted approximately fifty seconds before Carter was tased.  [<u>See</u> Explorer B. Galanos Dep., at 58:5-

11.]

Under this version of the facts, the officers gave one command—"Stop"—and yelled, "Hey

Stupid" before Officer Meritt tased Carter.  Carter may have disregarded the order to stop, but he did

not receive, and thus did not ignore, other commands.  Carter's raising his arms and yelling "What?" or

"Why?" at the officers, while perhaps odd, constitutes at most passive resistance, and it likely does not

constitute resistance at all.[5]  <u>See</u> <u>Bryan</u>, 630 at 829-30.  Moreover, the entire encounter appears to have

taken approximately fifty seconds.  Even if he did receive additional commands, it is unclear whether

Carter had enough time to comply before he was tased.  <u>See</u> <u>Garcia v. City of Imperial</u>, No. 08cv2357,

2010 WL 3834020, at *10 (S.D. Cal. Sept.28, 2010) ("Giving a warning without sufficient time to

comply is tantamount to not giving a warning at all.").  Therefore, this factor also weighs against

finding Defendant Meritt's use of the taser reasonable.

### 3.  Balancing the Competing Interests

Taking the facts in the light most favorable to Carter, a reasonable fact-finder could find that

the officers had only a minimal reason to use force against him.  This does not justify the use of an

intermediate level of force, such as a taser in dart mode.  Where facts are disputed, their resolution and

related determinations of credibility are "manifestly in the province of a jury."  <u>Wall v. Cnty. of</u>

---

[5] Carter also argues that, because they suspected he was drunk, the officers should have treated
him as an emotionally disturbed suspect.  [Pl.'s Opp'n, at 12-13.]  Although the Ninth Circuit has
"refused to establish two tracks of excessive force analysis, one for the mentally ill and one for serious
criminals," a "mentally ill individual is in need of a doctor, not a jail cell, and in the usual case—where
such an individual is neither a threat to himself nor to anyone else—the government's interest in
deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a
dangerous criminal."  <u>Bryan</u>, 630 F.3d at 829; <u>see also</u> <u>Deorle</u>, 272 F.3d at 1282-83 (noting that the
"problems posed by, and thus the tactics to be deployed against," mentally ill subjects are "ordinarily
different" from issues surrounding police interactions with subjects who do not suffer mental illness).
However, Carter has not offered, and the Court is unaware of, any legal authority or policy
consideration to support his contention that a voluntarily intoxicated subject should be treated like a
mentally ill subject.

Orange, 364 F.3d 1107, 1110 (9th Cir. 2004) (quoting Santos, 287 F.3d at 852).  Accordingly, the Court **DENIES** Defendants' motion for summary judgment that Officer Meritt' did not use excessive force against Carter.

### B.  Whether Officer Meritt Is Entitled to Qualified Immunity

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Even where an officer has violated a citizen's constitutional rights, the officer is entitled to qualified immunity if his "use force was 'premised on a *reasonable* belief that such force was lawful.'"  Bryan, 630 F.3d at 832 (quoting Deorle, 272 F.3d at 1285) (emphasis in original).  Qualified immunity insulates from liability "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986); see also Pearson, 129 S. Ct. at 818 (noting that qualified immunity protects officials' reasonable mistakes, whether "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact").  To decide whether Officer Meritt reasonably could have believed tasing Carter would not violate his constitutional rights, the Court must examine the state of the law at the time of the incident.  Carter bears the burden of showing that the right in question was clearly established at that time.  Robinson v. York, 556 F.3d 817, 826 (9th Cir. 2009).

Before the Ninth Circuit decided Bryan, it was unclear whether the use of a taser in dart mode constituted an intermediate level of force or something less.  Because this incident occurred before the Ninth Circuit's first opinion in Bryan,[6] the Court cannot conclude that, at the time the incident giving

---

[6] Bryan's procedural history at the Ninth Circuit has been a bit complicated.  In total, the Ninth Circuit issued three separate Bryan opinions: 590 F.3d 767 (9th Cir. Dec. 28, 2009) [hereinafter "Bryan I"], 608 F.3d 614 (9th Cir. June 18, 2010) [hereinafter "Bryan II"], 630 F.3d 805 (9th Cir. Nov. 30, 2010) [hereinafter Bryan or Bryan III].  Bryan I and II have both been withdrawn and superseded by Bryan III.

In all three decisions, the Ninth Circuit agreed with the district court that the use of the taser in that case was excessive.  The decisions go back and forth, however, on the second prong of the qualified immunity inquiry—whether the law was clearly established at the time of the incident.  Ultimately, Bryan III held that the defendant officer was entitled to qualified immunity because, prior to Bryan I, it was not clearly established that the use of a taser in dart mode constitutes an intermediate use of force.

rise to this action occurred, a reasonable officer in the situation confronting Officer Meritt would have known that using a taser in dart mode was unlawful.  Thus, Officer Meritt is entitled to qualified immunity.  The Court therefore **GRANTS** summary judgment on Carter's claim of excessive force under 42 U.S.C. § 1983.

## II.    42 U.S.C. § 1983 Claims Against the City—Failure to Supervise and Failure to Train

Carter's FAC makes two arguments against the City for Meritt's alleged use of excessive force—failure to train and failure to supervise.  [FAC, ¶¶ 26-30 (failure to train), ¶¶ 31-36 (failure to supervise).]  Defendants move for summary judgment on both.

### A.  Failure to Supervise

Carter's Opposition makes no arguments in defense of his failure to supervise claim.  At oral argument, Carter's counsel confirmed that Carter does not oppose summary judgment on this claim.  Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on Carter's claim for failure to supervise under § 1983.

### B.  Failure to Train

Carter's failure to train claim rests on two theories:  First, contrary to its stated policy, the City customarily issued tasers to officers who were not trained in the appropriate use of tasers.  Second, the Internal Affairs Division of the Carlsbad Police Department had a practice of exonerating officers accused of excessive force without sufficient analysis of the allegations and evidence.  As a result, Carter argues, the City failed to identify the need for training within the Police Department.

Municipalities are "persons" under § 1983 and may therefore face liability for constitutional deprivations.  See Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691 (1978); Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  Where, as here, an individual officer is entitled to qualified immunity even though a constitutional violation occurred, the officer's immunity will not protect a municipality from liability under § 1983.  Burke v. City of Alameda, 586 F.3d 725, 734 (9th Cir. 2009) ("[L]ocal governments are not entitled to the qualified-immunity defense . . . ." (citing Hervey v. Estes, 65 F.3d 784, 791 (9th Cir. 1995)).  But municipalities may not be sued under a

---

The incident that gave rise to this action occurred on October 31, 2009—nearly two months before the Ninth Circuit issued Bryan I.

theory of *respondeat superior* for injuries inflicted solely by their employees.  Connick v. Thompson, ---U.S.---, 131 S. Ct. 1350, 1359 (2011); Anderson v. Warner, 451 F.3d 1063, 1070 (9th Cir. 2006).  Rather, a municipality can face § 1983 liability only where "'action pursuant to official municipal policy' caused [the plaintiff's] injury." Connick, 131 S. Ct. at 1359 (quoting Monell, 436 U.S. at 691); see Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 131 S. Ct. at 1359 (citations omitted); see also Young v. City of Visalia, 687 F. Supp. 2d 1141, 1147 (E.D. Cal. 2009) (for the purposes of municipal liability, "a custom is a widespread and longstanding practice that 'constitutes the standard operating procedure of the local government entity'" (quoting Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996))).  "These are 'action[s] for which the municipality is actually responsible.'" Connick, 131 S. Ct. at 1359 (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479-80 (1986)).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick, 131 S. Ct. at 1359; see Long, 442 F.3d 1185-86 (a policy of "inaction" or "omission," such as a failure to train, can result in municipal liability).  For the City to face liability under § 1983 for a failure to train its police officers, Carter must show: "(1) he was deprived of a constitutional right; (2) the City had a training policy that amounts to deliberate indifference to the constitutional rights of the persons with whom its police officers are likely to come into contact; and (3) his constitutional injury would have been avoided had the City properly trained those officers." Blankenhorn, 485 F.3d at 484 (internal quotation marks and alterations omitted); see also Connick, 131 S. Ct. at 1359-60 (a municipality's policy of not training its employees is only actionable where it "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact'" (quoting Canton, 489 U.S. at 388)).

### 1.  Officer Training and the Issuance of Tasers

As discussed above, a material issue of fact exists as to whether Carter suffered a constitutional deprivation.  Thus, Carter has satisfied the first prong for establishing municipal liability.

Regarding the second prong, Carter claims the City had a practice of distributing X26 tasers to police officers, including Officer Meritt, without training them on the appropriate use of tasers.  This raises two issues: whether this was, in fact, the City's policy, and, if so, whether such a policy satisfies the "deliberate indifference" standard.

Viewing the evidence in the light most favorable to Carter, a material factual dispute exists as to whether the City customarily issued tasers to untrained officers.  The City's official policy states that no officer may be issued a taser unless he has been trained to use it properly.  [Pl.'s Opp'n, Ex. 29 (Carlsbad Police Department's policy 309.2, stating that "[p]ersonnel who have completed department approved training may be issued a TASER for use during their current assignment"); see also Meadows Dep., at 57:24-58:1 ("[N]o tasers are issued until after [officers] have had the training.").] However, the City has failed to provide evidence that any but a small minority of its officers were actually trained to use the X26 taser: though it is standard issue equipment, the City's records list only fifteen of its 115 officers as being trained and certified to use the X26 taser.  [See Pl.'s Opp'n, Ex. 17 (records of taser training and distribution); Meadows Dep., at 54:23-55:7, 69:21-23.]  Indeed, other than records indicating that fifteen officers received training, the City has not offered any documentary evidence that the training course on the X26 taser existed at all—no syllabi, no registration or sign-in sheets, and no course-related examinations.  [But see Boyd Dep., at 5:23-8:17 (stating he conducted at least one training about the X26 taser in 2006); Meritt Dep., at 159:6-163:19 (stating he attended a training on the X26 taser in 2006); Cpl. R. Galanos Dep., 127:1-129:7 (stating he attended a training on the X26 taser in 2006).]  Moreover, the relevant training purportedly took place during an eighteen-month period of time when the position of Training Coordinator for the Carlsbad Police Department remained vacant and a sergeant was supposed to conduct officer trainings in addition to his regular duties.  [See Meadows Dep., at 16:5-17:15.]  The foregoing is sufficient to establish a genuine issue of fact as to whether the City's standard procedure was to issue tasers to untrained officers.  See Ulrich v. City and Cnty. of San Francisco, 308 F.3d 968, 984-985 (9th Cir. 2002) ("Showing a 'longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity' is one way to establish municipal liability." (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)).

A practice of issuing tasers to untrained officers would demonstrate a "deliberate indifference to the rights of persons with whom the [City's police officers] come into contact." Canton, 489 U.S. at 388. Deliberate indifference requires a "'conscious' or 'deliberate' choice by the City to risk a 'likely' violation of constitutional rights." Price v. Sery, 513 F.3d 962, 973 (9th Cir. 2008) (citing Canton, 489 U.S. at 389). Failure to train demonstrates deliberate indifference when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390; see also Connick, 131 S. Ct. at 1360 ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." citing Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997)).

The alleged practice in this case mirrors the paradigmatic example provided by the Supreme Court in Canton of a practice so obviously likely to result in constitutional deprivations that the municipality's policymakers must have been aware of, and deliberately indifferent to, that risk:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing [and potentially combative suspects]. The city has armed its officers with [tasers], in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of . . . force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. . . .

Canton, 489 U.S. at 390 n.10. The City provides tasers to its officers for the very purpose of inflicting force upon criminal suspects when necessary to effect an arrest. To issue weapons without educating officers of the constitutional limitations on the use of force creates an obvious risk that the City's officers will violate people's constitutional rights, and therefore satisfies the deliberate indifference standard. Id.; see also Chew, 27 F.3d at 1445 (finding that a failure to train officers to properly handle police dogs provides a sufficient basis for municipal liability). Accordingly, Carter has satisfied the second prong for establishing municipal liability under § 1983.

To establish municipal liability, however, Carter must also show that the City's practice caused his constitutional deprivation. Anderson v. Warner, 451 F.3d 1063, 1070 (9th Cir. 2006) ("There also must be a 'direct causal link' between the policy or custom and the injury . . . ." (quoting McDade v.

West, 223 F.3d 1135, 1141 (9th Cir. 2000)); see Blankenhorn, 485 F.3d at 484 (a plaintiff must show proper training would have prevented his injury).  For Carter to show the City's alleged practice of issuing tasers to untrained officers caused his injury, he must establish that the officer who tased him was untrained.  Carter's claim fails on this third prong.

Carter argues that, as a result of the City's practice related to the issuance of tasers, Officer Meritt was not trained prior to the City issuing him an X26 taser.  Had Meritt been properly trained, the argument goes, he would not have tased Carter.

Like the majority of officers employed by the Carlsbad Police Department, Officer Meritt was issued an X26 taser, but Defendants cannot provide documentary evidence that Meritt was ever trained to use it appropriately.  The City has provided documentary records showing that Officer Meritt was trained to use a taser in 2004—more than five years before and with an older model taser than the one used in the incident with Carter.[7]  [See Pl.'s Ex. 19 (list of City police officers who were trained on the M26 model taser); Meritt Dep., 161:4-17.]  Based on this, Carter argues that a genuine issue of fact exists as to whether Officer Meritt was in fact trained on the appropriate use of tasers before he tased Carter.

However, Officer Meritt testified repeatedly during his deposition that he attended a training that addressed the policies for use of tasers, as well as technical issues related to the X26 model, in 2006.  [Meritt Dep., at 159:6-163:19; see also Meritt Decl., ¶ 5.]  He also testified that, to the best of his recollection, the taser training was part of a broader training on "arrest and control," which Meritt's training records indicate he attended in March 2006.  [Meritt Dep., at 159:6-163:19; Pl.'s Ex. 23 (Meritt's Individual Training Activity Log).]  Moreover, Sergeant Christopher Boyd, who conducted trainings for the City's police officers on the use of tasers, testified at his deposition that he had a "general recollection of having trained [Officer Meritt] on the X26 [taser] . . . sometime in 2006." [Boyd Dep., at 5:23-8:17.]

---

[7] The City argues its equipment-distribution records indicate Meritt was issued a taser in 2007, and therefore, because of the City's written policy that an officer must receive training before being issued a taser, the Court should infer from those records that Officer Meritt was also trained on taser use in 2007.  As discussed above, however, there is a genuine dispute of fact as to whether the City's actual practice matched its written policy.

1    Thus, the evidence supports Officer Meritt's argument that he was in fact trained on the X26

2    taser, despite the lack of specific documentation on this issue.  Carter has thus failed to establish "'that

3    [his] injury would have been avoided' had the City implemented proper policies."  Long, 442 F.3d at

4    1190 (quoting Gibson v. Cnty. of Washoe, Nev., 290 F.3d 1175, 1196 (9th Cir. 2002)).  Accordingly,

5    to the extent Carter's failure to train claim is based on the City's alleged practice if issuing tasers to

6    untrained officers, Defendants' motion for summary judgment is **GRANTED**.

7    ### 2.  Internal Affairs Investigations

8    Carter's second theory for his § 1983 claim against the City relates to its handling of internal

9    affairs investigations into allegations of excessive force by police officers.  One of the purposes of the

10   City's internal affairs investigations is to reveal areas where more training is needed.  [See Koran Dep.,

11   at 26:2-6.]  But, Carter argues, instead of providing objective inquiry and analysis, the City's internal

12   affairs investigations simply serve to exonerate the City's police officers of any alleged wrongdoing.

13   As a result, the investigations fail to identify training needs in the City's police department.  [Pl.'s

14   Opp'n, at 20-21 (arguing the City has a "custom of whitewashing [internal affairs] investigations and

15   reports).]

16   More specifically, Carter points to two investigations into allegations of excessive force against

17   Officer Meritt: one related to an incident in 2008, in which Officer Meritt used force, including his

18   taser, to subdue a fleeing suspect; the second being the investigation into the incident giving rise to this

19   action.  Carter argues both investigations inadequately dealt with discrepancies between various

20   witnesses' statements and failed to identify Officer Meritt's need for additional training—especially

21   related to taser use.  This is insufficient to establish a municipal policy or custom for the purpose of a

22   § 1983 claim.

23   A municipality may only face liability under § 1983 when "its deliberate policy caused the

24   constitutional violation alleged."  Blankenhorn, 485 F.3d at 484.  Carter points to just two internal

25   affairs investigations, both of which focused on Officer Meritt.[8]  However, even assuming the

26   _____

27   [8] Attempting to get around this failing, Plaintiff stretches the deposition testimony of Sergeant
     Greg Koran to suggest a broad practice of exonerating officers accused of excessive force.  Since 2009,
     Koran has been the Supervisor of the Professional Standards Unit, and he investigated Officer Meritt's
     conduct in the incident giving rise to this case.  Koran testified that he was unsure of how many
28   excessive force cases he had investigated, the results of all of his investigations, the number of

investigations failed to identify deficiencies in Officer Meritt's training, "evidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy." Blankenhorn, 485 F.3d at 484. Furthermore, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino, 99 F.3d at 918.

Carter has simply not provided evidence of a City practice of "whitewashing" internal affairs investigations and reports. Moreover, even assuming this was a City policy, Carter has not provided evidence demonstrating such a practice would satisfy the deliberate indifference standard or caused his injuries. See Connick, 131 S. Ct. at 1360 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train" (quoting Bryan City, 520 U.S. at 409)); Canton, 489 U.S. at 385 (requiring a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation"); see also Brown, 520 U.S. at 407-08 (the identified deficiency in the training program must be the "moving force" behind the alleged constitutional injury). Thus, Defendants' motion for summary judgment against this claim is **GRANTED**.

### III. State Law Claims Against Officer Meritt and the City—Battery, Negligence, and a Violation of California Civil Code § 52.1

Defendants also move for summary judgment on Carter's claims under state law: battery, negligence, and California Civil Code § 52.1. The question of whether Officer Meritt used excessive force underpins each of those claims. [See FAC ¶¶ 37-53.]

#### A. Battery

Battery claims brought under California law are analyzed under the reasonableness standard used to evaluate Fourth Amendment claims. Atkinson v. Cnty. of Tulare, ---F. Supp. 2d---, 2011 WL

---

excessive force cases investigated by the Professional Standards Unit since he joined it, or the number of cases in which an officer investigated for excessive force was not exonerated. Declining to speculate, Koran instead stated that he would need to review his files. [See Koran Dep., at 206:21-211:23.] From this, Plaintiff claims that "Koran testified that in the time he has been acting as Supervisor of the Professional Standards Unit he has never issued a report that did not exonerate the officer. Nor could he remember any such report ever being issued in his time with the department, and he has been there since 1995." [Pl.'s Opp'n, at 20-21.] Even if Plaintiff's characterization of Koran's testimony were accurate, one officer's failing to recall a report that found an officer's use of force excessive does not establish the existence of a municipal practice or policy.

1885769, at *17 (E.D. Cal. May 18, 2011) (negligence and battery "are measured by the same reasonableness standard of the Fourth Amendment"); <u>Munoz v. City of Union City</u>, 120 Cal. App. 4th 1077, 1102 n.6 (2004) ("Federal civil rights claims of excessive force are the federal counterpart to state battery . . . claims; in both, the plaintiff must prove the unreasonableness of the officer's conduct.").  Unlike § 1983 claims, however, qualified immunity does not insulate a police officer from suit for claims under California law.  <u>Robinson v. Solano Cnty.</u>, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc) ("California denies immunity to police officers who use excessive force in arresting a suspect."); <u>Garcia v. City of Imperial</u>, 2010 WL 3834020, at *14 (S.D. Cal. Sept. 28, 2010) (same).  California law "'has [also] rejected the <u>Monell</u> rule and imposes liability on [cities] under the doctrine of respondeat superior for acts of [city] employees.'"  <u>Edgerly v. City and Cnty. of San Francisco</u>, 599 F.3d 946, 961 (9th Cir. 2010) (quoting <u>Robinson</u>, 278 F.3d at 1016) (alterations in original)).

As discussed above, Defendants are not entitled to summary judgment that Officer Meritt's use of force was objectively reasonable. Thus, the motion for summary judgment on Carter's battery claim is **DENIED** as to both Officer Meritt and the City.

## B.  Negligence

Negligence claims stemming from allegations of excessive force by a police officer are also analyzed under the Fourth Amendment's reasonableness standard.  <u>Atkinson</u>, 2011 WL 1885769, at *17 (negligence and battery "are measured by the same reasonableness standard of the Fourth Amendment").  Like state law claims for battery, § 1983 qualified immunity does not protect police officers from suits for negligence under state law.  <u>Robinson</u>, 278 F.3d at 1016.  Thus, Officer Meritt is not entitled to summary judgment on Carter's negligence claim.

Regarding the City, however, Defendants argue California Government Code § 815(a) insulates the City from liability for Officer Meritt's negligence.  Section 815(a) provides that, except as provided by statute, "A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."  But this argument ignores Government Code § 815.2, which makes clear that a public entity faces *respondeat superior* liability for injuries caused by its employees, and is only immune from liability when the individual employee is also immune.  Cal. Gov. Code § 815.2; <u>see also</u> <u>Robinson</u>, 278 F.3d at 1016 (California law only grants municipal immunity where the individual employee would also be immune); <u>Scott v. Cnty. of</u>

1   Los Angeles, 27 Cal. App. 4th 125, 139-40 (1994) ("Under Government Code section 815.2,

2   subdivision (a), the [City] is liable for acts and omissions of its employees under the doctrine of

3   respondeat superior to the same extent as a private employer. Under subdivision (b), *the [City] is*

4   *immune from liability if, and only if, [the employee] is immune.*" (emphasis in original)); White v.

5   Cnty. of Orange, 166 Cal. App. 3d 566, 570 (1985) ("in governmental tort cases, the rule is liability,

6   immunity is the exception") (citation and internal quotation marks omitted).  Because Officer Meritt is

7   not immune from Carter's negligence claim, neither is the City.

8          Accordingly, the motion for summary judgment on Carter's negligence claim is **DENIED** as to

9   both Defendants.

10  **C.  California Civil Code § 52.1**

11         California Civil Code § 52.1 permits an individual to bring civil action for interference with his

12  rights under the United States or California Constitutions by threats, intimidation, or coercion.

13  Venegas v. Cnty. of Los Angeles, 153 Cal. App. 4th 1230, 1239 (2007).  "Section 52.1 does not

14  provide any substantive protections; instead, it enables individuals to sue for damages as a result of

15  constitutional violations."  Reynolds v. Cnty. of San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996),

16  *overruled on other grounds*, Acri v. Varian Assocs., Inc., 114 F.3d 999, 999-1000 (1997).

17         Carter's claim under California Civil Code § 52.1 stems from his excessive force claim under

18  the Federal Constitution.  Thus, it is also evaluated under the reasonableness standard of the Fourth

19  Amendment.  See Jones v. Kmart Corp., 17 Cal. 4th 329, 331 (1998) (the elements of claims under

20  Cal. Civ. Code § 52.1 are essentially identical to claims under § 1983).  Defendants argue, however,

21  that, unlike other claims under state law, if Officer Meritt is entitled to qualified immunity under

22  federal law, then both he and the City are also immune from suit under § 52.1.  [Defs.' MSJ, at 23.]

23         To support this argument, Defendants rely entirely on M.L. ex rel. Autry v. City & Cnty. of San

24  Francisco, 2006 WL 335386, at *7 (N.D. Cal. Feb. 13, 2006).  The Court is aware of just one other

25  decision supporting Defendant's position: Briley v. City of Hermosa Beach, 2008 WL 4443894, at *6

26  (C.D. Cal.  Sept. 29, 2008).  Both the Ninth Circuit and the California Court of Appeal, however, have

27  expressly held that qualified immunity under federal law does not apply to claims under California

28  Government Code § 52.1.  Cousins v. Lockyer, 568 F.3d 1063, 1072 (9th Cir. 2009) (holding that

    "California law is clear" that qualified immunity is a federal doctrine that does not apply to tort or civil

rights claims under state law); <u>Venegas</u>, 153 Cal. App. 4th at 1246 ("[Q]ualified immunity of the kind applied to actions brought under 42 [U.S.C. § 1983] does not apply to actions brought under section 52.1.").[9]

Thus, neither Officer Meritt nor the City is entitled to qualified immunity from Carter's claim under § 52.1.  Defendants' motion for summary judgment on this claim is **DENIED**.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  The Court orders as follows:

Defendants' motion for summary judgment that Defendant Scott Meritt's use of force was objectively reasonable is **DENIED**;

Defendants' motion for summary judgment that Meritt is entitled to qualified immunity from Plaintiff's claim of excessive force under 42 U.S.C. § 1983 is **GRANTED**;

Defendants' motion for summary judgment on Plaintiff's claim against the City of Carlsbad for failure to supervise under 42 U.S.C. § 1983 is **GRANTED**;

Defendants' motion for summary judgment on Plaintiff's claim against the City of Carlsbad for failure to train under 42 U.S.C. § 1983 is **GRANTED**;

Defendants' motion for summary judgment on Plaintiff's claim under California law for battery is **DENIED** as to both Defendants;

Defendants' motion for summary judgment on Plaintiff's claim under California law for negligence is **DENIED** as to both Defendants; and

Defendants' motion for summary judgment on Plaintiff's claim under California Government Code § 52.1 is **DENIED** as to both Defendants.


**IT IS SO ORDERED.**


**DATED:** 6/30/2011

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

---

[9] Notably, the Ninth Circuit decided <u>Cousins</u> after <u>Briley</u> and <u>Autry</u> were decided, and thus impliedly overruled both on this point.